**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NORTH DAKOTA**

In re: Bankruptcy No.: 26-30179

Kelly L. Rexine, Chapter 7

Debtor.
_____________________________/

**MEMORANDUM AND ORDER**

On March 6, 2026, Debtor Kelly Rexine petitioned for bankruptcy relief under Chapter 7 of the Bankruptcy Code. Debtor's scheduled assets included $1,565.15 in a single checking account ("Single Account") and $2,309.83 in a joint checking account Debtor owns with his wife ("Joint Account"). Debtor claimed $1,173.86 in wages deposited in the Single Account and $1,732.37 deposited in the Joint Account exempt under N.D.C.C. §§ 28-22-18, 32-09.1-03, the North Dakota wage exemption. Debtor also claimed $6,627.50 in personal property exempt under N.D.C.C. § 28-22-03, the North Dakota head of family exemption.

The Trustee filed an Objection to Debtor's Claim of Exemptions and a Memorandum in Support of Trustee's Objections to Debtor's Claim of Exemptions, arguing the exemptions listed above should be disallowed. Debtor filed a timely Response to Trustee's Objection to Exemptions. The Court held an evidentiary hearing on May 28, 2026, and oral argument on June 2, 2026. For the reasons provided below, the Debtor's exemptions are allowed in part and disallowed in part.

## I. BACKGROUND

Debtor and his wife married in 2007 and have four children. While they remain legally married, they have not lived together for about a year. Under their unique living

arrangement, the children remain in the family home 100% of the time while Debtor and his wife take turns staying in the family home. Debtor explained that he and his wife rotate on a 2-day, 2-day, 3-day schedule where he is at the house for two days, away for two days, and at the house again for three days before the cycle repeats. Each spouse is responsible for 50% of the expenses for their children and 50% of the household bills. They share a joint checking account from which they pay these expenses. Debtor emphasized that, while both he and his wife live in the house and claim it as their primary residence, they do not live there together. Debtor stays with his mother while his wife is at the family home.

Consistent with this arrangement, Debtor and his wife filed a joint tax return in 2025 that indicated they both reside in the family home. Additionally, their homeowners' policy lists both Debtor and his wife as insureds, with his wife serving as the primary insured.

On January 7, 2026, Debtor's wife filed a voluntary petition under Chapter 7 of the Bankruptcy Code. Bankr. No. 26-30009. On her petition, she indicated that she lives at the family home and checked the box that she was married and had not lived anywhere else in the last three years. She scheduled the following personal property exempt under N.D.C.C. § 22-28-03: "typical household goods and furnishings" valued at $4,000; two TVs, one iPhone 17, two iPads, one smartwatch valued at $1,200; a wedding ring valued at $2,000, and a dog valued at $1.

On Debtor's bankruptcy petition, he also indicated that he lives at the family home and that he is married and has not lived anywhere else in the last three years. Debtor scheduled the following personal property exempt under N.D.C.C. § 22-28-03:

"typical household goods and furnishings" valued at $2,500; three TVs, one iPhone, and a family laptop valued at $600; firearms valued at $1,250; a wedding band valued at $500; cash on hand totaling $200; funds in a joint checking account totaling $577.46; funds in a single checking account totaling $391.29; funds in two BankNorth checking accounts totaling $2; and earned but unpaid wages in the sum of $606.75.

Debtor holds two bank accounts that he uses regularly, the Single Account and the Joint Account. Debtor uses his Single Account for day-to-day transactions, including wages and other miscellaneous deposits and expenses. Deposits from BankNorth represent Debtor's wage payments while deposits bearing any other name are not wages. At the hearing, the Court received the following evidence of Debtor's financial transactions:

- Single Account bank statement for the dates of January 31, 2026, to February 28, 2026, and a copy of Debtor's transaction history from February 28, 2026, to March 7, 2026.
- Joint Account bank statement for the dates of January 31, 2026, to February 28, 2026, and a copy of Debtor's transaction history from February 28, 2026, to March 7, 2026.

As of January 31, 2026, the Single Account statement reflected a beginning balance of $7,949.94. On Debtor's petition date, March 6, 2026, the Single Account bank statement reflected a balance of $1,407.58.[1] From February 1, 2026, to the Petition Date, Debtor made multiple deposits into and withdrawals from the Single Account. Notably, Debtor received direct deposits from BankNorth for $2,426.95 on

[1] This sum differs from the $1,565.15 included on Debtor's schedules.

February 11, 2026, and February 25, 2026. Debtor also received a deposit of $15,156.36 from a 401k loan on February 17, 2026.

Similarly, Debtor initiated multiple transactions involving the Joint Account. Debtor transferred money from the Single Account into the Joint Account and from the Joint Account into the Single Account. At the hearing, Debtor testified that he and his wife each own 50% of the Joint Account. Debtor and his wife use the Joint Account to pay household bills and expenses for their children. Both Debtor and his wife transfer money from their individually held accounts into the Joint Account. Debtor's wage payments from BankNorth are never deposited directly into the Joint Account.

As of January 31, 2026, the Joint Account statement reflects a beginning balance of $1,691.49. On March 6, 2026, the date of Debtor's bankruptcy petition, the Joint Account bank statement reflects a balance of $4,619.66. From January 31, 2026, to the petition date, Debtor transferred from his Single Account into the Joint Account totaling $3,829.65. Also from January 31, 2026, to the petition date, Debtor transferred from the Joint Account into his Single Account totaling $2,317.84. Numerous other transactions occurred between the Joint Account and other unidentified accounts during this time period.

## II. ANALYSIS

Section 541(a)(1) of the Bankruptcy Code provides that, at the commencement of a case, the bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property." 11 U.S.C. § 541(a)(1). The Bankruptcy Code allows debtors to exempt certain property from their bankruptcy estates. 11 U.S.C. § 522(b)(1). "Exempt property is excluded from property of the estate available to satisfy debts." Nessan v.

Lovald, 494 Fed. App'x. 691, 693 (8th Cir. 2012) (quotation omitted). Section 522(b)(2) authorizes states to opt out of the federal property exemptions enumerated in section 522(d). 11 U.S.C. § 522(b)(2). Exercising this grant of authority, the North Dakota Legislature enacted a statute limiting its residents to claiming the state exemptions rather than the federal exemptions. See N.D.C.C. § 28-22-17.

Exemptions are liberally construed in favor of the debtor. Moon v. Hurd (In re Hurd), 441 B.R. 116, 119 (B.A.P. 8th Cir. 2010); Mattern v. Frank J. Mattern Est. ex rel. Erickson, 864 N.W.2d 458, 462 (N.D. 2015). The Trustee, as the objecting party, bears the burden of proof that Debtor's exemptions are not properly claimed. Fed. R. Bankr. P. 4003(c); see Walters v. Bank of the W. (In re Walters), 450 B.R. 109, 112 (B.A.P. 8th Cir. 2011). "Once the objector meets its burden, the burden of production shifts to the debtor to produce evidence that the claimed exemption is proper, though the burden of persuasion remains with the objector." In re Walters, 450 B.R. at 113; see also In re Nascene, 2020 WL 6875946, at *4 (Bankr. D. Minn. Oct. 8, 2020) (the debtor bears the burden to establish funds are traceable to an exempt source); In re Drescher, 2013 WL 4525232, at *3 (Bankr. D. Or. Aug. 27, 2013) ("the burden of production shifts to 'to the debtor to come forward with unequivocal evidence to demonstrate that the exemption is proper.'" (quoting Carter v. Anderson (In re Carter), 182 F.3d 1027, 1029 n.3 (9th Cir. 1999)); Tydings v. Reed (In re Tydings), 2020 WL 5258457, at *2 (W.D. Mo. Sept. 3, 2020) (the trustee maintains the burden of persuasion, but "the burden of production shifts to the debtor to show that the claimed exemption is proper.").

To determine the intent of the North Dakota Legislature in promulgating exemption statutes, the Court first looks to the specific statutory language. State v.

Gaddie, 971 N.W.2d 811, 819 (N.D. 2022) (citing State v. McCreary, 967 N.W. 2d 447, 450–51 (N.D. 2021)). Statutes are interpreted to give "meaning and effect to every word, phrase, and sentence, and [] not [to] adopt a construction which would render part of the statute mere surplusage." State v. Berkley, 24 N.W.3d 69, 71 (N.D. 2025) (quoting State v. Enriquez, 10 N.W.3d 777, 782–83 (N.D. 2024)). Statutes are construed "in a practical manner, giving consideration to the context of the statutes and the purpose for which they were enacted." Grand Prairie Agric., LLP v. Pelican Twp. Bd. of Supervisors, 955 N.W.2d 87, 89 (N.D. 2021) (quoting Laufer v. Doe, 946 N.W.2d 707, 710 (N.D. 2020)). When two statutes are at issue, the Court, if possible, must interpret them to be in harmony, not in conflict. Sample v. North Dakota Dep't of Transp., 775 N.W.2d 707, 710 (N.D. 2009).

### A. Head of a Family Exemption

Debtor claims several personal property items exempt under N.D.C.C. § 28-22-03. This statute provides, in part:

> [T]he head of a family, personally or by that person's agent, may select from that person's other personal property, any goods, chattels, merchandise, money, and other personal property not exceeding in value the sum of seven thousand five hundred dollars, which also is exempt from all attachment or mesne process, levy and sale upon execution, and any other final process issued from any court.

Section 28-22-01.1 defines "head of a family" as:

> 1. The husband or wife when the claimant is a married person.
>
> 2. Every person who has residing on the premises with the person and under the person's care and maintenance, any of the following:
>
>    a. That person's child or the child of that person's deceased spouse, whether by birth or adoption.
>
>    b. A minor brother or sister or the minor child of a deceased brother or sister.

c. A father, mother, grandfather, or grandmother.

d. The father or mother or grandfather or grandmother of a deceased husband or wife.

e. Any other of the relatives mentioned in this section who have attained the age of majority and are unable to take care of or support themselves.

3. Every person who provides support for unmarried minor children of a previous marriage of the person, even though the children do not reside on the premises with the person.

N.D.C.C. § 28-22-01.1.

The Trustee objects to Debtor's claimed exemptions under section 28-22-03, arguing that Debtor may not claim property exempt under this statute because Debtor is married and his wife claimed the exemption in her earlier bankruptcy case. In the Trustee's view, allowing both Debtor and his wife to claim the exemption would result in impermissible, duplicative, spouse-by-spouse exemption stacking—even though they filed separate bankruptcy cases. The Trustee contends that Debtor should have objected to his wife's "head of a family" exemption during her bankruptcy case if Debtor wanted to preserve the exemption for his bankruptcy case. Because he failed to object, Debtor is barred from claiming it for the duration of their marriage, according to the Trustee.

Additionally, the Trustee argues that the North Dakota Legislature wrote the statute in the singular, meaning that only the husband or the wife may use the exemption while they are married. "The statute does not provide for multiple heads of family," according to the Trustee. Although Debtor and his wife are separated, the Trustee emphasizes that the critical question is whether they are married. The Trustee

claims that if the Legislature intended for both a husband and wife to qualify for the exemption, it would have included clarifying language.

Conversely, Debtor argues that the exemption statute must be liberally construed in his favor, entitling him to claim the exemption. Focusing on the text of section 28-22-03, Debtor emphasizes that "the head of *a* family" is entitled to use the exemption, not "the head of *the* family." While conceding he and his wife remain legally married, Debtor argues that he and his wife are separated, and they no longer live together. More importantly, he cares for his children, and he and his children comprise his family unit, qualifying him for the exemption.

Both Debtor and the Trustee agree that, if Debtor and his wife were not legally married, they would each qualify as the "head of a family" for purposes of claiming the exemption under section 28-22-03.

Exemption rights are determined as of the petition date. <u>See</u> <u>Armstrong v. Peterson</u> (<u>In re Peterson</u>), 897 F.2d 935, 937 (8th Cir. 1990). On the petition date, Debtor qualified as "head of a family" under the definition in section 28-22-01.1 because he resided with his children and provided care and maintenance for them. The question is whether Debtor, who is separated from his spouse but remains married, may claim the "head of a family" exemption under section 28-22-03 if his spouse claimed the exemption in a prior bankruptcy proceeding. The answer is "yes."

The primary objective in statutory interpretation is to ascertain the legislative intent. <u>State ex rel. Clayburgh v. Am. W. Cmty. Promotions, Inc.</u>, 645 N.W.2d 196, 205 (N.D. 2002) (citation omitted). As the North Dakota Supreme Court explained:

> In ascertaining the Legislature's intent, we first look to the plain language of the statute and give each word of the statute its ordinary meaning. <u>See</u>

> Estate of Thompson, 1998 ND 226, ¶ 7, 586 N.W.2d 847. We construe the statute as a whole and give effect to each of its provisions if possible. Id. If the language of the statute is clear and unambiguous, we cannot ignore that language under the pretext of pursuing its spirit because the legislative intent is presumed clear from the face of the statute. Id.

Id.

Section 22-18-03 does not prohibit Debtor's interpretation. It does not limit the exemption to one per family or prohibit a claimant from claiming this exemption in more than one proceeding. It does not say "only one spouse," "unless the spouse has previously claimed the exemption" or "one exemption per marriage." The consequence of a spouse previously claiming the exemption is not incorporated into the definition. Instead, it defines the status by reference to "the claimant," and the claimant qualifies if the claimant is a husband or wife in a marriage and if that husband or wife cares for his or her children, the child of a deceased spouse, siblings, parents, grandparents, or unmarried minor children of a previous marriage. See N.D.C.C. § 28-22-01.1. To interpret this exemption to allow one spouse to permanently exhaust the other's entitlement to claim this exemption in any future proceeding while the couple remains married without clear limiting language is contrary to the premise that exemptions are liberally construed in favor of a debtor.[2] If the North Dakota Legislature intended to

---

[2] Since the statute was designed to provide an exemption in the context of North Dakota debt collection proceedings, the permanent marriage penalty advocated by the Trustee appears particularly harsh and unworkable. It is possible that a creditor of Spouse A may pursue debt collection proceedings early in the marriage and a different creditor may pursue debt collection proceedings later in the marriage against the same spouse. Assuming Spouse A cares for a family member, Spouse A could exempt property under the "head of a family" exemption on both occasions and then claim the exemption in a bankruptcy proceeding as well. Under the Trustee's interpretation, once Spouse A claimed the exemption, Spouse B is barred from asserting it in any North Dakota debt collection or bankruptcy proceeding for the duration of their marriage. This

allow one spouse to claim the "head of a family" exemption at the expense of the spouse who seeks to claim it later, the Legislature would have included limiting language.

An example of the North Dakota Legislature's deliberate decision to limit a spouse's exemption may be found in a different statute in Chapter 28-22. Specifically, N.D.C.C. § 28-22-03.1(1), which grants an alternative exemption in lieu of the homestead, expressly provides that the exemption is unavailable "if the resident exemption claimant, <u>the spouse of the resident exemption claimant, or other head of the family</u> of the resident exemption claimant has chosen the homestead exemption[.]" N.D.C.C. § 28-22-03.1(1) (emphasis added). In other words, when the Legislature wanted one spouse's exemption to affect the other spouse's eligibility, it knew how to say so.

Further, the Trustee's interpretation that Debtor is prohibited from claiming the exemption during the duration of his marriage because his spouse previously claimed it reads more into the statute than exists. "When engaging in statutory interpretation, [the North Dakota Supreme Court] has consistently recognized that it must be presumed the legislature intended all that it said, said all that it intended to say, and meant what it has plainly expressed." <u>Est. of Christeson v. Gilstad</u>, 829 N.W.2d 453, 456 (N.D. 2013). Under the clear and unambiguous language of N.D.C.C. § 28-22-01.1(1), the "head of a family" is "[t]he husband or wife when the claimant is a married person." While the language plainly limits the "head of a family" to a husband or wife, it does not specify

---

outcome is harsh, difficult to police and not supported by the plain language of the statute.

any temporal application or proceeding limitation. In the absence of this limitation, the Court will not read one into the statute. The Court presumes the North Dakota Legislature said all that it intended to say.

Additionally, the Trustee's proposed interpretation of section 28-22-03 would impose a "marriage penalty," which the North Dakota Supreme Court declined to endorse in interpreting the homestead exemption under N.D.C.C. § 47-18-01. See Anderson v. Kaler (In re Anderson), 932 N.W.2d 506, 509 (N.D. 2019). Referring to a definition offered by a California court, the North Dakota Supreme Court explained that "a marriage penalty occurs by limiting the exemption for married individuals when a different result would occur if the property owners were not married." Id.
If Debtor and his wife were not married, they would each qualify as the "head of a family" for purposes of claiming the exemption under section 28-22-03 in separate bankruptcy proceedings. If the Court declines to adopt the Trustee's proposed interpretation, Debtor is entitled to claim the "head of a family" exemption in this bankruptcy proceeding and any bankruptcy proceeding he files individually in the future whether he is married or not, provided he meets the other criteria of the statute. If the Court adopts the Trustee's proposed interpretation, Debtor is barred from claiming the "head of a family" exemption for the duration of his marriage, imposing a marriage penalty on him. For this reason and the other reasons provided above, the Court rejects the Trustee's interpretation and overrules his objection to Debtor's claimed exemption under section 28-22-03.

## B. Wage Exemption

### 1. Wages do not lose their exempt status under N.D.C.C. §§ 28-22-18 and 32-09.1-03 when deposited into a bank account if they can be traced and identified.

Debtor claims $1,173.86 in the Single Account and $1,732.37 in the Joint Account exempt under N.D.C.C. §§ 28-22-18 and 32-09.1-03. The Trustee objects to this exemption, claiming these statutes do not provide Debtor with an avenue to exempt wages after they are paid and deposited.

Under section 28-22-18, "The wages of a debtor are exempt from all process or levy only to the extent provided in section 32-09.1-03." N.D.C.C. § 28-22-18. Section 32-09.1-03 provides, in relevant part:

> 1. The maximum part of the aggregate disposable earnings of an individual for any workweek which is subject to garnishment may not exceed the lesser of:
>
> a. Twenty-five percent of disposable earnings for that week.
>
> b. The amount by which disposable earnings for that week exceed forty times the federal minimum hourly wage prescribed by section 6(a)(1) of the Fair Labor Standards Act of 1938, as amended [Pub. L. 95-151; 91 Stat. 1245; 29 U.S.C. 206] or any equivalent multiple thereof prescribed by regulation by the secretary of labor in case of earnings for any pay period other than a week, in effect at the time the earnings are payable.

N.D.C.C. § 32-09.1-03(1).

The Trustee argues that section 32-09.1-03 imposes a restriction on the sum of disposable earnings[3] subject to garnishment. He observes that the plain language of

[3] "Disposable earnings" is defined as "that part of the earnings of any individual remaining after the deduction from those earnings of any amounts required by other law to be withheld." N.D.C.C. § 32-09.1-01(2).

section 32-09.1-02 provides, "a garnishment action brought pursuant to this chapter is the exclusive procedure which may be used to execute on earnings of a debtor while those earnings are held by a third-party employer," and suggests the exemption under section 32-09.1-03 is limited to garnishment. See Doc. 19 (citing N.D.C.C. § 32-09.1-02). He also emphasizes that section 32-09.1-03 specifically refers to "earnings." According to the Trustee, upon deposit in the wage earner's bank account, the funds lose their character as "earnings" and transition into "monies."[4] Since neither section 28-22-18 nor section 32-09.1-03 include language allowing a claimant to exempt "monies" or "earnings after deposit," the Trustee claims these funds are not protected by the exemption. The Court is not persuaded.

"Wages" is not defined in Chapter 32-09.1. Consequently, the Court considers its plain, ordinary and commonly understood meaning. State v. Reese, 31 N.W.3d 644, 647 (N.D. 2025); N.D.C.C. § 1-02-02. Black's Law Dictionary defines "wage" as:

> Payment for labor or services, usu. based on time worked or quantity produced; specif., compensation of an employee based on time worked or output of production.

---

[4] Citing to In re Palidora, 310 B.R. 164, 167 (Bankr. D. Ariz. 2004), the Trustee urges the Court to find that the wage exemption protections cease when a debtor receives his or her compensation. In re Palidora is distinguishable. While the court held that "the Arizona wage exemption ceases to apply upon the debtor's receipt of those wages," it relied on an opinion by the Arizona Court of Appeals which recognized that under Arizona law "earnings" transform into "monies," and that "monies" are not protected by the Arizona exemption laws. Id. at 166–67. Arizona Revised Statute § 12-1598.01(A), provides that, "earnings become monies … upon their disbursement by the employer…" "Monies" is defined as including "cash, credit and accounts, but does not include earnings as defined in § 12-1598, paragraph 4." Ariz. Rev. Stat. § 12-1570(6). The Trustee has not cited, nor has the Court identified, any North Dakota law that similarly provides that wages transform into "monies" or fall outside the confines of North Dakota exemption statutes upon receipt or deposit. Consequently, the Court rejects the Trustee's invitation to adopt the In re Palidora holding.

> • Wages include every form of remuneration payable for a given period to an individual for personal services, including salaries, commissions, vacation pay, bonuses, and the reasonable value of board, lodging, payments in kind, tips, and any similar advantage received from the employer. An employer usu. must withhold income taxes from wages.

Wage, Black's Law Dictionary (12th ed. 2024). It also describes wages as "the compensation paid or to be paid for services, whether computed by the day, week, or month, or by the piece or job." Id. (quoting Lindley Daniel Clark, The Law of the Employment of Labor 45–46 (1911)).

Debtor's compensation from his employer falls within the commonly understood meaning of wages because he received payment for personal services. Under section 28-22-18, Debtor's wages are exempt to the extent provided in section 32-09.1-03. See N.D.C.C. 28-22-18. Section 32-09.1-03 allows Debtor to exempt 25% of his disposable wages because wages are a specific form of earnings. In fact, wages are included within the definition of "earnings" provided under Chapter 32-09. See N.D.C.C. § 32-09.1-01(3).[5]

The Trustee's claim that Debtor's wages or earnings no longer qualify for protection upon delivery to Debtor is likewise rejected. "Earnings," by definition, include money that has been paid to Debtor. See N.D.C.C. § 32-09.1-01(3). Similarly, the commonly understood meaning of "wages" includes "compensation paid or to be paid for services." See Wage, Black's Law Dictionary (12th ed. 2024).

Further, as this Court has held on several occasions, depositing wages in an account with other fund sources, without more, does not change the wages' exempt

[5] "'Earnings' means compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus, or otherwise, and includes periodic payments pursuant to a pension or retirement program." N.D.C.C. § 32-09.1-01(3).

status. See e.g., In re Fandrich, 2008 WL 4610030, at *4 (Bankr. D.N.D. Oct. 16, 2008) (emphasizing that "statutorily exempt funds—whether wages or otherwise—do not lose their exempt status solely by virtue of deposit into a personal bank account.") (citing cases from six jurisdictions in support); see also In re Colling, 2003 WL 25273710, at *3 (Bankr. D. Idaho Feb. 20, 2003) ("it appears the Idaho courts would allow an exemption in wages even where those earnings have been paid to the debtor and deposited in a bank account, so long as the debtor is able to trace the source of the exempt funds back to her wages."); In re Norris, 203 B.R. 463, 466 (Bankr. D. Nev. 1996) ("A deposit of the earnings, whether by the debtor or directly by the employer, should not cause the statutorily exempt wages to lose their exempt status as long as the proceeds of the account are traceable to those earnings."; In re Platt, 270 B.R. 773, 776 (Bankr. D. Or. 2001) (under Oregon law, wages deposited remain exempt even after deposit).

While wages do not lose their exempt status immediately upon deposit, commingling may result in exemption disallowance if tracing is no longer possible due to an inability to identify the wages. In other words, "determination of whether wages remain wages after they are deposited into an account hinges on whether the wages can be traced and identified within the accounts." In re Fandrich, 2008 WL 4610030, at *4.

Debtor argues that the funds in the Single Account are derived from his earnings. In support of this claim, Debtor testified that deposits bearing the name BankNorth are wage deposits. While it is true that there are deposits from BankNorth into the Single Account, the Court received evidence that the wage deposits are commingled with funds from nonexempt sources in the Single Account. For example, Debtor testified that

he received a 401k loan deposit on February 17, 2026, for $15,156.36. Additionally, Debtor's Single Account bank statement shows deposits from other nonexempt sources such as Paypal, Venmo and a mobile check deposit. The Trustee met his burden of showing that Debtor deposited his wages in the Single Account with other fund sources of sums sufficient to raise a question regarding whether wages may be identified. This evidence is sufficient to shift the burden of production to Debtor, who carries the burden of tracing and identifying the source of all or part of the Single Account sum he seeks to exempt.

The Trustee established that Debtor made no wage deposits directly into the Joint Account. Rather, the evidence shows that Debtor transferred funds from the Single Account to the Joint Account. Given that the Joint Account includes funds from nonexempt sources, Debtor carries the burden of tracing and identifying the source of all or part of the Joint Account balance he seeks to exempt.

**2. Debtor met his burden of tracing $1,176.20 to wages in the Single Account and $0 to wages in the Joint Account.**

Bankruptcy courts typically employ one of three tracing methods: the lowest intermediate balance test ("LIBT"), the percentage approach, and first-in first-out ("FIFO"). The bankruptcy court in <u>In re Tydings</u> explained the methods:

> The LIBT is typically applied where a debtor commingles his own funds with funds he is holding in trust for another. If the account balance drops to zero, the trust funds are lost and subsequent deposits are considered non-trust funds. If the account drops to a balance less than the amount of trust funds, but greater than zero, the trust funds are limited to the lowest intermediate balance in the account. Thus, this test is based on the fiction that the debtor would withdraw the non-trust funds first, retaining as much as possible of the trust funds in the account. <u>In re Marve</u>, 484 B.R. 735, 738 (Bankr. N.D. Ind. 2013)

> The percentage approach requires the determination of the exempt funds to the account total when the deposit is made. That percentage is then applied to the disputed funds (i.e., the balance in the account on the petition date) to determine the portion of exempt funds and non-exempt funds in the account. In re Ross, 2012 WL 3817792 (Bankr. S.D. Ind. Sept. 4, 2012). This method assumes that no intermediate deposits are made between the initial deposit of the exempt funds and the petition date.
>
> FIFO is a standard accounting method. The initial fact which must be established is the balance in the account immediately preceding the deposit of the exempt funds. In re Marve, 484 B.R. at 741. From there, FIFO assumes that the first funds deposited in a commingled account are also the first funds withdrawn from that account. Christensen v. Pack (In re Christensen), 149 P. 3d 40, 50 (Nev. 2006).

In re Tydings, 2020 WL 1510025, at *3 (Bankr. W.D. Mo. Mar. 27, 2020), aff'd sub nom., Tydings v. Reed (In re Tydings), 2020 WL 5258457 (W.D. Mo. Sept. 3, 2020) (internal citations altered).

Sections 28-22-18 and 32-09.1-03 do not provide a lookback period for the exemption nor do they provide a specific tracing method. In such instances, courts have discretion to "select the [tracing] method best suited to achieve a fair and equitable result on the facts before them." In re Bentley, 622 B.R. 296, 309 (Bankr. W.D. Okla. 2020) (quoting U.S. v. Henshaw, 388 F.3d 738, 741 (10th Cir. 2004)). The determination is made on a case-by-case basis. In re Tydings, 2020 WL 1510025, at *2; In re Minc, 673 B.R. 206, 213–14 (Bankr. E.D. Mich. 2025) ("The Court agrees that of the various possible tracing methods, the FIFO approach is appropriate in this case.").

The Trustee and Debtor stipulated that the FIFO analysis should be applied in this case. The Court agrees and finds that the FIFO tracing method ensures a fair and equitable result for the parties based on the facts.

"The FIFO method allocates payments first to the unpaid amount of the oldest purchase and then sequentially to the remaining debts in the order in which they were

incurred[.]" In re McAllister, 267 B.R. 614, 624 (Bankr. N.D. Iowa 2001). This requires an accounting of the order that the funds were deposited, the status of those funds as they were deposited (wages or nonwages) and an attribution of withdrawals to the deposited funds, with the first/oldest deposit reduced first. Id.

Neither the Trustee nor Debtor provided the Court with a tracing analysis. Instead, they rely on the bank statements received into evidence. Consequently, the Court prepared the attached Appendix, showing its analysis. See In re Minc, 673 B.R. at 214 (conducted the court's own analysis after determining it was "not satisfied with either side's FIFO tracing analysis.").

**1. Single Account**

Debtor's Single Account bank statement shows a beginning balance of $7,949.94 on January 31, 2026. Debtor failed to meet his burden of producing evidence that the source of these funds was wages. Consequently, the Court begins with the premise that the beginning balance is from sources other than wages. The Court also assumes that all deposits from sources other than BankNorth are from nonexempt sources because Debtor testified that deposits from BankNorth encompass all his wages.

As the Appendix shows, the Court deducted withdrawals from the beginning balance until these funds were exhausted by a $2,400 withdrawal on February 18, 2026. It then deducted withdrawals from the wages deposited on February 11, 2026. When these funds were exhausted on February 19, 2026, the Court began deducting withdrawals from sources other than wages deposited between the first wage deposit on February 11, 2026, and the second wage deposit on February 25, 2026. It took until March 5, 2026, to exhaust these funds. On March 5, 2026, Debtor withdrew $2,159.58

to pay for an expense at Window World. This transaction depleted the nonwage funds, compelling the Court to look to the second wage deposit to fund part of this withdrawal.[6] Consequently, the Court deducted $1,250.75 from wages deposited on February 25, 2026, leaving $1,176.20 in wages and a total account balance of $1,407.58. The wages qualify as disposable earnings under section 32-09.1-03. After subtracting 25% from $1,176.20 in disposable earnings under section 32-09.1-03(1)(a), Debtor is entitled to exempt $882.15 under section 28-22-18.

**2. Joint Account**

Debtor's Joint Account statement reflects a beginning balance of $1,691.49 as of January 31, 2026. As with the Single Account, Debtor failed to carry his burden of producing evidence that the beginning balance is derived from wages. Consequently, the Court assumes the beginning balance is from sources of funds other than Debtor's wages.

From January 31, 2026, to March 6, 2026 (the petition date), Debtor and his wife deposited $4,617.01 into the Joint Account from sources other than Debtor's Single Account. Debtor testified that his wages are only deposited into the Single Account. Therefore, the Court finds that these deposits came from nonexempt sources.

From January 31, 2026, to the petition date, Debtor transferred a total of $3,829.65 from the Single Account to the Joint Account. Under FIFO principles applicable to both the Single Account and Joint Account, the Court finds Debtor failed to meet his burden of showing that the funds transferred from his Single Account into the Joint Account are traceable to wages. As the highlighted figures on the Appendix show,

[6] For the purposes of this analysis, the Court did not consider transactions that occurred on or after March 6, 2026, the petition date.

each transfer from the Single Account to the Joint Account reduced the balance of nonwage fund sources under the FIFO analysis. In other words, Debtor transferred no wages to the Joint Account during the relevant time period. Debtor offered no evidence to the contrary. The Trustee's objection to Debtor's exemption of funds held in the Joint Account is sustained. Debtor's $1,732.37 exemption under sections 28-22-18 and 32-09.1-03 is disallowed.

## III. CONCLUSION

For the reasons provided above, IT IS ORDERED that:

1. The Trustee's objection to Debtor's "head of a family" exemption is overruled. Debtor's $6,627.50 exemption in personal property under N.D.C.C. § 28-22-03 is allowed.
2. The Trustee's objection to Debtor's exemption of $1,173.86 in wages deposited in the Single Account is sustained in part and overruled in part. Debtor is allowed an $882.15 exemption under N.D.C.C. §§ 28-22-18, 32-09.1-03.
3. The Trustee's objection to Debtor's exemption of $1,732.37 in wages deposited in the Joint Account is sustained. Debtor's exemption of these funds under N.D.C.C. §§ 28-22-18, 32-09.1-03 is disallowed.

Dated: October 9, 2026.

Shon Hastings

Shon Hastings, Judge
United States Bankruptcy Court

| Date | Starting Balance | Nonwage Deposits | Wage Deposits | Withdrawals | 1 - Nonwages | 2 - Wages | 3 - Nonwages | 4 - Wages | 5 - Nonwages |
|---|---|---|---|---|---|---|---|---|---|
| | $ 7,949.94 | | | | $ 7,949.94 | | | | |
| 1/31/2026 | | | | $ 1,044.87 | $ 6,905.07 | | | | |
| 2/1/2026 | | | | $ 100.00 | $ 6,805.07 | | | | |
| 2/2/2026 | | $ 1,008.00 | | | $ 7,813.07 | | | | |
| 2/2/2026 | | $ 40.00 | | | $ 7,853.07 | | | | |
| 2/2/2026 | | | | $ 1,478.11 | $ 6,374.96 | | | | |
| 2/2/2026 | | | | $ 46.71 | $ 6,328.25 | | | | |
| 2/3/2026 | | | | $ 128.99 | $ 6,199.26 | | | | |
| 2/4/2026 | | | | $ 722.07 | $ 5,477.19 | | | | |
| 2/4/2026 | | | | $ 200.00 | $ 5,277.19 | | | | |
| 2/5/2026 | | $ 100.00 | | | $ 5,377.19 | | | | |
| 2/5/2026 | | | | $ 75.06 | $ 5,302.13 | | | | |
| 2/5/2026 | | | | $ 370.00 | $ 4,932.13 | | | | |
| 2/6/2026 | | | | $ 12.17 | $ 4,919.96 | | | | |
| 2/6/2026 | | | | $ 70.00 | $ 4,849.96 | | | | |
| 2/8/2026 | | $ 146.22 | | | $ 4,996.18 | | | | |
| 2/9/2026 | | | | $ 657.36 | $ 4,338.82 | | | | |
| 2/9/2026 | | $ 1,004.00 | | | $ 5,342.82 | | | | |
| 2/9/2026 | | | | $ 408.00 | $ 4,934.82 | | | | |
| 2/9/2026 | | $ 8.00 | | | $ 4,942.82 | | | | |
| 2/9/2026 | | $ 100.00 | | | $ 5,042.82 | | | | |
| 2/10/2026 | | | | $ 277.87 | $ 4,764.95 | | | | |
| 2/10/2026 | | | | $ 6.42 | $ 4,758.53 | | | | |
| 2/10/2026 | | | | $ 135.33 | $ 4,623.20 | | | | |
| 2/11/2026 | | $ 50.20 | | | $ 4,673.40 | | | | |
| 2/11/2026 | | | | $ 250.00 | $ 4,423.40 | | | | |
| 2/11/2026 | | | | $ 159.12 | $ 4,264.28 | | | | |
| 2/11/2026 | | | | $ 500.00 | $ 3,764.28 | | | | |
| 2/11/2026 | | | $ 2,426.95 | | | $ 2,426.95 | | | |

| Date | Starting Balance | Nonwage Deposits | Wage Deposits | Withdrawals | 1 - Nonwages | 2 - Wages | 3 - Nonwages | 4 - Wages | 5 - Nonwages |
|---|---|---|---|---|---|---|---|---|---|
| 2/12/2026 | | | | $ 104.54 | $ 3,659.74 | | | | |
| 2/12/2026 | | | | $ 189.99 | $ 3,469.75 | | | | |
| 2/13/2026 | | | | $ 83.62 | $ 3,386.13 | | | | |
| 2/13/2026 | | | | $ 1,000.00 | $ 2,386.13 | | | | |
| 2/13/2026 | | | | $ 500.00 | $ 1,886.13 | | | | |
| 2/16/2026 | | $ 351.80 | | | | | $ 351.80 | | |
| 2/16/2026 | | | | $ 45.00 | $ 1,841.13 | | | | |
| 2/16/2026 | | | | $ 12.32 | $ 1,828.81 | | | | |
| 2/16/2026 | | | | $ 78.00 | $ 1,750.81 | | | | |
| 2/17/2026 | | $ 131.42 | | | | | $ 483.22 | | |
| 2/17/2026 | | | | $ 424.77 | $ 1,326.04 | | | | |
| 2/17/2026 | | | | $ 100.00 | $ 1,226.04 | | | | |
| 2/17/2026 | | | | $ 154.15 | $ 1,071.89 | | | | |
| 2/17/2026 | | | | $ 19.54 | $ 1,052.35 | | | | |
| 2/17/2026 | | $ 854.00 | | | | | $ 1,337.22 | | |
| 2/17/2026 | | $ 15,156.36 | | | | | $ 16,493.58 | | |
| 2/18/2026 | | | | $ 64.19 | $ 988.16 | | | | |
| 2/18/2026 | | | | $ 9.66 | $ 978.50 | | | | |
| 2/18/2026 | | $ 964.00 | | | | | $ 17,457.58 | | |
| 2/18/2026 | | | | $ 49.48 | $ 929.02 | | | | |
| 2/18/2026 | | | | $ 2,400.00 | $ (1,470.98) | $ 955.97 | | | |
| 2/19/2026 | | | | $ 40.67 | | $ 915.30 | | | |
| 2/19/2026 | | | | $ 8,775.00 | | $ (7,859.70) | $ 9,597.88 | | |
| 2/20/2026 | | | | $ 14.00 | | | $ 9,583.88 | | |
| 2/20/2026 | | | | $ 3,260.00 | | | $ 6,323.88 | | |
| 2/20/2026 | | | | $ 25.92 | | | $ 6,297.96 | | |
| 2/20/2026 | | | | $ 39.60 | | | $ 6,258.36 | | |
| 2/20/2026 | | $ 35.46 | | | | | $ 6,293.82 | | |
| 2/20/2026 | | | | $ 16.43 | | | $ 6,277.39 | | |

| Date | Starting Balance | Nonwage Deposits | Wage Deposits | Withdrawals | 1 - Nonwages | 2 - Wages | 3 - Nonwages | 4 - Wages | 5 - Nonwages |
|---|---|---|---|---|---|---|---|---|---|
| 2/21/2026 | | $ 39.00 | | | | | $ 6,316.39 | | |
| 2/21/2026 | | | | $ 13.95 | | | $ 6,302.44 | | |
| 2/21/2026 | | | | $ 128.95 | | | $ 6,173.49 | | |
| 2/21/2026 | | | | $ 25.00 | | | $ 6,148.49 | | |
| 2/22/2026 | | | | $ 34.38 | | | $ 6,114.11 | | |
| 2/22/2026 | | | | $ 73.28 | | | $ 6,040.83 | | |
| 2/22/2026 | | | | $ 21.20 | | | $ 6,019.63 | | |
| 2/22/2026 | | | | $ 3.23 | | | $ 6,016.40 | | |
| 2/22/2026 | | | | $ 9.00 | | | $ 6,007.40 | | |
| 2/22/2026 | | | | $ 14.67 | | | $ 5,992.73 | | |
| 2/22/2026 | | | | $ 6.30 | | | $ 5,986.43 | | |
| 2/22/2026 | | | | $ 25.00 | | | $ 5,961.43 | | |
| 2/23/2026 | | | | $ 17.22 | | | $ 5,944.21 | | |
| 2/23/2026 | | | | $ 36.95 | | | $ 5,907.26 | | |
| 2/23/2026 | | | | $ 18.46 | | | $ 5,888.80 | | |
| 2/23/2026 | | | | $ 176.45 | | | $ 5,712.35 | | |
| 2/23/2026 | | | | $ 7.96 | | | $ 5,704.39 | | |
| 2/23/2026 | | | | $ 103.44 | | | $ 5,600.95 | | |
| 2/23/2026 | | $ 148.00 | | | | | $ 5,748.95 | | |
| 2/23/2026 | | $ 146.22 | | | | | $ 5,895.17 | | |
| 2/23/2026 | | $ 145.00 | | | | | $ 6,040.17 | | |
| 2/23/2026 | | | | $ 53.94 | | | $ 5,986.23 | | |
| 2/23/2026 | | | | $ 417.00 | | | $ 5,569.23 | | |
| 2/24/2026 | | | | $ 11.31 | | | $ 5,557.92 | | |
| 2/24/2026 | | $ 210.00 | | | | | $ 5,767.92 | | |
| 2/25/2026 | | | | $ 16.95 | | | $ 5,750.97 | | |
| 2/25/2026 | | $ 3.36 | | | | | $ 5,754.33 | | |
| 2/25/2026 | | | | $ 9.92 | | | $ 5,744.41 | | |
| 2/25/2026 | | | $ 2,426.95 | | | | | $ 2,426.95 | |

| Date | Starting Balance | Nonwage Deposits | Wage Deposits | Withdrawals | 1 - Nonwages | 2 - Wages | 3 - Nonwages | 4 - Wages | 5 - Nonwages |
|---|---|---|---|---|---|---|---|---|---|
| 2/25/2026 | | | | $ 87.38 | | | $ 5,657.03 | | |
| 2/25/2026 | | | | $ 56.25 | | | $ 5,600.78 | | |
| 2/26/2026 | | | | $ 12.94 | | | $ 5,587.84 | | |
| 2/26/2026 | | | | $ 710.00 | | | $ 4,877.84 | | |
| 2/26/2026 | | | | $ 1,179.46 | | | $ 3,698.38 | | |
| 2/26/2026 | | | | $ 11.05 | | | $ 3,687.33 | | |
| 2/27/2026 | | | | $ 12.08 | | | $ 3,675.25 | | |
| 2/27/2026 | | | | $ 14.99 | | | $ 3,660.26 | | |
| 2/27/2026 | | | | $ 19.50 | | | $ 3,640.76 | | |
| 2/27/2026 | | | | $ 57.12 | | | $ 3,583.64 | | |
| 2/27/2026 | | $ 0.15 | | | | | | | $ 0.15 |
| 2/27/2026 | | $ 207.40 | | | | | | | $ 207.55 |
| 2/27/2026 | | | | $ 6.62 | | | $ 3,577.02 | | |
| 2/27/2026 | | | | $ 20.50 | | | $ 3,556.52 | | |
| 2/28/2026 | | | | $ 16.31 | | | $ 3,540.21 | | |
| 2/28/2026 | | | | $ 91.57 | | | $ 3,448.64 | | |
| 2/28/2026 | | | | $ 23.21 | | | $ 3,425.43 | | |
| 2/28/2026 | | | | $ 48.74 | | | $ 3,376.69 | | |
| 2/28/2026 | | | | $ 364.18 | | | $ 3,012.51 | | |
| 3/1/2026 | | | | $ 1,500.00 | | | $ 1,512.51 | | |
| 3/1/2026 | | | | $ 19.99 | | | $ 1,492.52 | | |
| 3/1/2026 | | | | $ 34.55 | | | $ 1,457.97 | | |
| 3/1/2026 | | | | $ 10.00 | | | $ 1,447.97 | | |
| 3/2/2026 | | $ 23.83 | | | | | | | $ 231.38 |
| 3/2/2026 | | | | $ 20.35 | | | $ 1,427.62 | | |
| 3/2/2026 | | | | $ 65.09 | | | $ 1,362.53 | | |
| 3/3/2026 | | | | $ 296.11 | | | $ 1,066.42 | | |
| 3/3/2026 | | | | $ 26.95 | | | $ 1,039.47 | | |
| 3/4/2026 | | | | $ 18.04 | | | $ 1,021.43 | | |

| Date | Starting Balance | Nonwage Deposits | Wage Deposits | Withdrawals | 1 - Nonwages | 2 - Wages | 3 - Nonwages | 4 - Wages | 5 - Nonwages |
|---|---|---|---|---|---|---|---|---|---|
| 3/4/2026 | | | | $ 50.00 | | | $ 971.43 | | |
| 3/5/2026 | | | | $ 10.74 | | | $ 960.69 | | |
| 3/5/2026 | | | | $ 51.84 | | | $ 908.85 | | |
| 3/5/2026 | | | | $ 2,159.60 | | | $ (1,250.75) | $ 1,176.20 | |
| | | | Ending Balances: | | 0 | 0 | 0 | $ 1,176.20 | $ 231.38 |

The figures highlighted represent Debtor's transfers to the Joint Account.

There is also a deposit of $145 from Bank North on February 23 titled "Expense Report." For purposes of this analysis, the Court did not consider the deposit wages because all other wage deposits bear the title "Payroll."

| | |
|---|---|
| Total Ending Balance, as of 3/5/2026 | $ 1,407.58 |
| Traceable To Wages | $ 1,176.20 |
| 75% of Wages, Exempt | $ 882.15 |